# SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER

**CLEVELAND, OHIO 44113**

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV16868321 | D2 FX | 30063513 |

Rule 4 (B) Ohio

Rules of Civil Procedure

|  |  |
|---|---|
| TARKETT USA INC., ETC. | **PLAINTIFF** |
| VS | |
| HARNIX CORPORATION, ETC., ET AL | **DEFENDANT** |

## SUMMONS

```
J. RON HARRIS
HARNIX CORPORATION, DBA LINRON
6110 THOMAS ROAD
HOUSTON TX 77041
```

You have been named defendant in a complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

#### Said answer is required to be served on:



Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

**Plantiff's Attorney**

```
KIMBERLY MOSES
THE CALFEE BUILDING

1405 EAST 6TH STREET
CLEVELAND, OH 44114-0000
```

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

#### Case has been assigned to Judge:

```
JOHN P O'DONNELL
Do not contact judge. Judge's name is given for
attorney's reference only.
```



**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE |
|---|
| Aug 29, 2016 |

By _____
Deputy

COMPLAINT FILED    08/29/2016

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV16868321 | D3 FX | 30063514 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

TARKETT USA INC., ETC.    **PLAINTIFF**
**VS**
HARNIX CORPORATION, ETC., ET AL    **DEFENDANT**

**SUMMONS**

LINDA KRIENKE
HARNIX CORPORATION, DBA LINRON
6110 THOMAS ROAD
HOUSTON TX 77041

You have been named defendant in a complaint
(copy attached hereto) filed in Cuyahoga County
Court of Common Pleas, Cuyahoga County Justice
Center, Cleveland, Ohio 44113, by the plaintiff
named herein.

You are hereby summoned and required to
answer the complaint within 28 days after service
of this summons upon you, exclusive of the day of
service.

Said answer is required to be served on:



Said answer is required to be served on Plaintiff's
Attorney (Address denoted by arrow at left.)

**Plaintiff's Attorney**

KIMBERLY MOSES
THE CALFEE BUILDING

1405 EAST 6TH STREET
CLEVELAND, OH 44114-0000

Your answer must also be filed with the court
within 3 days after service of said answer on
plaintiff's attorney.

If you fail to do so, judgment by default will be
rendered against you for the relief demanded in the
complaint.

Case has been assigned to Judge:

JOHN P O'DONNELL
Do not contact judge. Judge's name is given for
attorney's reference only.



**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE |
|---|
| Aug 29, 2016 |

By _____
Deputy

COMPLAINT FILED    08/29/2016

CMSN130

# SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER
### CLEVELAND, OHIO 44113

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV16868321 | D4 FX | 30063515 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

| TARKETT USA INC., ETC. | PLAINTIFF |
|---|---|
| VS | |
| HARNIX CORPORATION, ETC., ET AL | DEFENDANT |

**SUMMONS**

GILLES DE BEAUMONT
HARNIX CORPORATION, DBA LINRON
6110 THOMAS ROAD
HOUSTON TX 77041

You have been named defendant in a complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

#### Said answer is required to be served on:



Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

**Plantiff's Attorney**

KIMBERLY MOSES
THE CALFEE BUILDING

1405 EAST 6TH STREET
CLEVELAND, OH 44114-0000

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

#### Case has been assigned to Judge:

JOHN P O'DONNELL
Do not contact judge. Judge's name is given for attorney's reference only.

NAILAH K. BYRD
Clerk of the Court of Common Pleas

| DATE |
|---|
| Aug 29, 2016 |

By_____
Deputy

COMPLAINT FILED   08/29/2016



CMSN130



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**August 29, 2016 15:00**

By: KIMBERLY MOSES 0029601

Confirmation Nbr. 841889

TARKETT USA INC., ETC.                    CV 16 868321

vs.

HARNIX CORPORATION, ETC., ET AL           **Judge:**

JOHN P. O'DONNELL

**Pages Filed:** 48

| | | |
|---|---|---|
| TARKETT USA INC., d/b/a TARKETT | ) | CASE NO. |
| NORTH AMERICA, | ) | |
| 30000 Aurora Road | ) | |
| Solon, Ohio 44139 | ) | JUDGE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **(With Jury Demand)** |
| HARNIX CORPORATION, d/b/a LINRON, | ) | |
| c/o Statutory Agent | ) | |
| John R. Harris | ) | |
| 1717 Yale St. | ) | |
| Houston, Texas 77008 | ) | |
| | ) | |
| J. RON HARRIS, | ) | |
| HARNIX CORPORATION, d/b/a LINRON, | ) | |
| 6110 Thomas Road | ) | |
| Houston, Texas 77041 | ) | |
| | ) | |
| LINDA KRIENKE, | ) | |
| HARNIX CORPORATION, d/b/a LINRON, | ) | |
| 6110 Thomas Road | ) | |
| Houston, Texas 77041 | ) | |
| | ) | |
| GILLES de BEAUMONT, | ) | |
| HARNIX CORPORATION, d/b/a LINRON, | ) | |
| 6110 Thomas Road | ) | |
| Houston, Texas 77041 | ) | |
| | ) | |
| Defendants. | ) | |

Tarkett USA Inc. d/b/a Tarkett North America ("Tarkett"), through counsel and for its

Complaint against Harnix Corporation d/b/a Linron ("Linron"), J. Ron Harris ("Harris"), Linda

Krienke f/k/a Linda Nix ("Krienke"), and Gilles de Beaumont ("de Beaumont") (collectively, the

"Linron Defendants"), states as follows:

{03912134.DOCX;1 }

## The Parties

1. Tarkett is a privately-held Delaware corporation with its principal place of business in Solon, Ohio. Tarkett, along with its affiliated companies, manufacturers, markets, and distributes a wide range of commercial and residential flooring products.

2. Linron is a Texas corporation with its principal place of business in Houston, Texas. Linron is a distributor, reseller, and installation project manager of flooring materials, including some manufactured by Tarkett.

3. Harris and Krienke are principals and officers of Linron. Harris and Krienke are Texas residents who have transacted business in this jurisdiction.

4. de Beaumont, who upon information and belief is a Texas resident, was employed by Tarkett (or an affiliate or predecessor in interest of Tarkett) for over forty (40) years, through March 13, 2014. Following the termination of his employment with Tarkett, de Beaumont went to work for Linron. In his capacity as an employee of Tarkett, as well as his employment by Linron, de Beaumont has transacted business in this jurisdiction.

## BACKGROUND FACTS

### The 1996 Agreement

5. On November 7, 1996, Tarkett, through its predecessors in interest, Azrock Industries Inc. and National Floor Products Company, Inc., entered into an Agreement with Linron, Harris, and Krienke (then known as Linda Nix). A copy of the 1996 Agreement is attached as Exhibit A.

6. Tarkett's principle purpose for entering into (and later continuing) the business relationship with Linron, Harris, and Krienke was that they had the ability to resell Tarkett's products to Walmart and to manage the installation process of those products. At all relevant

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

times herein, Linron, Harris, and Krienke were aware that the resale and installation of its products to Walmart was critical, and indeed essential, to Tarkett.

7. Although it is and was customary for Tarkett to sell its flooring products through distributors based on geographic territories, that was not the case with Linron. Because of the importance of Walmart to the business relationship, Linron's sales "territory" was customer-centric, rather than geographically based. This sales structure was reflected in the 1996 Agreement, which provided that Linron was to act as a reseller of Tarkett flooring and wall base products (collectively, "Tarkett Products") to Walmart, along with a few other customers.

8. Linron, Harris, and Krienke understood the importance Tarkett placed on selling its products to Walmart. Linron, Harris, and Krienke specifically agreed that during the term of the 1996 Agreement and for a year after they would not "for any reason" compete with Tarkett. *See* Exhibit A, ¶4. More specifically, Linron, Harris, and Krienke agreed they would not sell any products to Walmart that competed with Tarkett Products (the "Prohibited Activities Provision"). The "Prohibited Activities Provision" is set forth in ¶4 of the 1996 Agreement.

9. Linron, Harris, and Krienke acknowledged and agreed that in the event that any of them were to breach the Prohibited Activities Provision of the 1996 Agreement, Tarkett would suffer "immediate and irreparable harm and injury for which [Tarkett] will have not [sic] adequate remedy at law" and would "absolutely" entitle it to "equitable relief, including specific performance." *See* Exhibit A, ¶4/b). In the event of a breach, the right to specific performance was to be in addition to any other remedies available to Tarkett. *Id.*

10. Linron, Harris, and Krienke explicitly acknowledged that the restrictions set forth in the Prohibited Activities Provision of the 1996 Agreement were "reasonable and necessary to protect the legitimate business interests of [Tarkett]." *Id.*

11. Linron, Harris, and Krienke further agreed that they would use their "best efforts" to perform according to the terms of the 1996 Agreement. *See id.* at ¶1/b).

12. In addition to soliciting and processing Walmart's orders for Tarkett Products, Linron, Harris, and Krienke managed the installation of Tarkett Products at Walmart's stores, as well as the removal of the old flooring material. . This process was an integral part of the parties' relationship because the old flooring that was removed from Walmart locations was returned to Tarkett for recycling and use in its flooring products, particularly the flooring products that Tarkett made to order for Walmart.

13. A typical vinyl composite tile ("VCT") that Tarkett produced for Walmart consisted of approximately 30% of recycled material. The use of recycled materials not only supported Tarkett's (and Walmart's) sustainability initiatives, it also reduced Tarkett's manufacturing costs. Linron, Harris, and Krienke knew that the removal/recycling process was critical to Tarkett's sustainability initiative and agreed, through their course of dealing and otherwise, to use their best efforts to support Tarkett in this regard.

14. The 1996 Agreement also provided that Linron was responsible for handling invoicing, as well as any customer complaints and claims. *Id.* at ¶2.

15. For nearly 20 years, Tarkett Products had been sold to Walmart.

16. On an average annual basis, $14,500,000 of Tarkett Products were sold to Walmart through 2013.

### de Beaumont's Employment with Tarkett and Linron

17. When the parties entered into the 1996 Agreement, the VCT that Tarkett produced for Walmart was manufactured at a facility in Houston, Texas ("Texas Facility"); between 2001 and

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

2014, de Beaumont operated as the Houston-based Tarkett executive responsible for manufacturing and sales of VCT.

18. In his role as a Tarkett executive, de Beaumont had extensive access to a wealth of confidential and proprietary information including, but not limited to, product information, product development and design, the identity of customers and employees; manufacturing and plant operations, vendor information; marketing information and strategies; sales training techniques and programs; acquisition and divestiture opportunities and discussions; and data processing and management information systems, programs, and practices. de Beaumont knew this information, along with other information, was confidential and/proprietary, and, as a Tarkett executive, he was charged with ensuring and maintaining its confidentiality.

19. At or around late July of 2014, Tarkett moved its VCT manufacturing operations from Houston, Texas to Florence, Alabama ("Alabama Facility").

20. When Tarkett moved its Texas operations to Alabama, it re-assigned de Beaumont to a sales management role in Montreal, Canada, which he did not regard favorably. Shortly thereafter, de Beaumont terminated his employment with Tarkett. In doing so, de Beaumont entered into a Separation Agreement and Release, a copy of which is attached as Exhibit B (the "de Beaumont Separation Agreement"). de Beaumont received severance pay, as well as other benefits in connection with his separation from Tarkett. *See* Exhibit B, ¶2.

21. The de Beaumont Separation Agreement contained a non-competition provision in which de Beaumont agreed that for a period of one year following the termination of his employment he would not become employed by, own, manage, operate or control, or participate, directly or indirectly in any business that competes with Tarkett. *See id.* at ¶5/B.

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

22. The de Beaumont Separation Agreement also contained a very narrow and limited exception to the non-competition provision that was applicable only if two specific conditions were met. *Id.* Specifically, for the one-year duration of his non-compete, de Beaumont was permitted to perform services on behalf of Linron 1) *provided that* such services did not involve products that competed with Tarkett's products, and 2) *provided that* de Beaumont continued to comply with the provisions set forth in ¶4 of the de Beaumont Separation Agreement, which prohibited de Beaumont from using or disclosing Tarkett's confidential or proprietary information . *Id.* There was no restriction on where de Beaumont could work or what he could do following the expiration of his one-year non-compete with Tarkett. *Id.*

23. By contrast, ¶4 of the de Beaumont Separation Agreement survives the one-year non-compete period. *See id.* at ¶4. That paragraph specifically acknowledges that through the course of his employment, de Beaumont "received and/or had access to various proprietary or confidential information of [Tarkett]." *Id.* That confidential and proprietary information includes, but is not limited to: product information, product development and design, the identity of customer and employees; vendor information; marketing information and strategies; sales training techniques and programs; acquisition and divestiture opportunities and discussions; and data processing and management information systems, programs, and practices. de Beaumont agreed that he would not copy, disclose, or otherwise use any of this information following the termination of his employment with Tarkett. *See id.*

24. de Beaumont did, in fact, perform services on behalf of Linron following the termination of his employment and, in violation of the terms of the de Beaumont Separation Agreement, relied upon, copied, used, and/or disclosed some or all of the types of confidential and proprietary information described in ¶4.

25. Upon information and belief, during and after the one year following his employment with Tarkett, de Beaumont also transacted business with entities that compete either directly or indirectly with Tarkett.

26. Upon information and belief, after being transferred (and demoted) to Montreal, Canada against his wishes, de Beaumont repeatedly disparaged (and continues to disparage) Tarkett to its existing and prospective customers in a deliberate effort to impair Tarkett's current and prospective business opportunities.

<h3 align="center">Suspension of Sales to Walmart</h3>

27. In anticipation of the transition and before moving its manufacturing operations from Texas to Alabama, Tarkett produced enough VCT to meet Walmart's flooring orders through 2014.

28. Not unexpectedly, the new operations in the Alabama Facility encountered a few obstacles, and for a limited time after Tarkett opened the Alabama Facility, the VCT produced there did not meet Tarkett's quality standards. These production problems led to removal and replacement of VCT in a handful of Walmart stores.

29. Linron, Harris, and Krienke were aware of Tarkett's production issues and helped to process customer complaints and claims relating to product concerns, including those lodged by Walmart. Tarkett, in the meantime, was making every effort to promptly remedy the manufacturing glitches associated with the new Alabama Facility.

30. In April of 2015, as Tarkett diligently worked to resolve these issues, Linron, Harris, and Krienke informed Tarkett that it had been "kicked out of Walmart," and that Walmart refused to accept Tarkett flooring until the production problems were resolved.

31. Tarkett representatives later discovered that Walmart never made these statements, and that the statements made by Linron, Harris, and Krienke were not true. At the time, however, Tarkett had no reason to believe that the information provided by Linron, Harris, and Krienke was false.

32. In order to be accommodating and to preserve its valuable customer relationship with Walmart, and based on the (mis)representation that it had been "kicked out of Walmart," Tarkett agreed to allow Linron to source other products at Walmart and to temporarily forebear from enforcing the Prohibited Activities Provision of the 1996 Agreement, *but only* until such time as Tarkett was able to resolve the short-term production issues at the Alabama Facility. This agreement is reflected in two amendments to the 1996 Agreement, which are attached as Exhibits C and D.

### Tarkett's Production Issues are Resolved but the Linron Defendants Refuse to Resume Sales to Walmart

33. Tarkett resolved the production issues within a few months and informed Linron, Harris, and Krienke of that fact. Nevertheless, the Linron Defendants generally and Krienke particularly continued to complain about the quality of Tarkett's flooring. But when Tarkett asked the Linron Defendants to articulate the precise reasons for their concerns or to specifically identify the quality standards that were not met, the Linron Defendants were unable (or unwilling) to do so . Even when Tarkett produced VCT at its Alabama Facility in accordance with the same performance metrics as the VCT previously produced in the Texas Facility, the Linron Defendants continued to generically complain about alleged lack of product quality.

34. Rather than using their best efforts to further their long-standing business relationship with Tarkett and get Tarkett Products back into Walmart stores as the parties agreed, Linron,

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

Harris, and Krienke refused to work with Tarkett without offering any specific explanation as to why Tarkett's Products were no longer acceptable.

35. Nevertheless, in a good-faith attempt to accommodate its long-standing business partner, Tarkett produced a set of performance metrics to be applied to the Alabama-produced tile, performance metrics which mirrored the product quality standards for the Texas-produced tile. The Linron Defendants reluctantly agreed that if the Alabama-produced tile satisfied these performance metrics, then the Linron Defendants would resume the sale of Tarkett Products to Walmart. A copy of the signed Metrics Agreement is attached as Exhibit E.

36. By June of 2015, Tarkett was still experiencing resistance from the Linron Defendants, so it invited them to view the Alabama Facility and the VCT that was being produced there.

37. In a side-by-side comparison, de Beaumont -- who as indicted above had been the Tarkett executive responsible for the sale of this very product before terminating his employment with Tarkett -- was unable to identify which VCT was produced at the old Texas Facility and which was made in the Alabama Facility. Krienke commented that if Tarkett "had made tile like this in January, we would not have had a problem."

38. Although Tarkett had informed the Linron Defendants that its Alabama tile satisfied the performance metrics agreed to in Exhibit E, and although the Linron Defendant themselves were unable to distinguish the "old" tile from the new, the Linron Defendants never even attempted to resume sales of Tarkett Products to Walmart. Instead, the Linron Defendants have been selling Tarkett's competitor's products, such as Armstrong flooring, to Walmart and other customers. In doing so, Linron, Harris, and Krienke continued to (mis)lead Tarkett into believing that Walmart refused to accept Tarkett Products, when in fact that was not the case.

39. The Linron Defendants sold very limited Tarkett Products after May 1, 2015 that were produced at the Alabama Facility to Walmart or anyone else.

40. In addition to selling Tarkett's competitor's products (i.e., Armstrong products) to Walmart, de Beaumont, as a Linron employee and/or agent, attempted to sell (and may in fact have been successful in doing so) products made by Vinylasa, a Mexican flooring company, that competes with Tarkett. Upon information and belief, at all relevant times herein, some or all of the Linron Defendants were diverting business from Tarkett to Vinylasa.

41. In addition, following the termination of his employment with Tarkett, de Beaumont, individually and as an agent/employee of Linron, actively and intentionally disparaged Tarkett to Tarkett's current and prospective customers and made affirmative efforts to divert business away from Tarkett to Tarkett's competitors and/or to himself.

### Termination of the 1996 Agreement

42. Over the course of 2015, as Tarkett was striving to understand and allay the Linron Defendants' production concerns, Tarkett and Linron were negotiating to replace the 1996 Agreement with a new one. Tarkett entered into those negotiations in good faith.

43. Through the course of the negotiations, and with specific reference to the Prohibited Activities Provision, the Linron Defendants informed Tarkett that Walmart would no longer accept Tarkett or any other supplier as a sole supplier, as it had previously, and was now mandating a second source for its store operational needs.

44. Tarkett has since learned that the Linron Defendants' representations were false and that Walmart was not, in fact, insisting on double-sourcing its flooring. In further discussions with Walmart, Tarkett has learned that Walmart's architect, who was largely responsible for the

flooring selection, was not even aware of the early 2015 production problems at the Alabama Facility., in spite of the Linron Defendants' representations to the contrary.

45. The Linron Defendants deliberately misrepresented that Walmart demanded dual flooring sources in order to avoid the enforcement of the Prohibited Activities Provision of the 1996 Agreement and to avoid the inclusion of a similar provision in a new agreement.

46. Tarkett reasonably relied on the Linron Defendants' representations, as the Linron Defendants had intended.

47. On August 7, 2015, Linron gave notice of its intent to terminate the 1996 Agreement. A copy of the termination letter is attached as Exhibit F. The termination letter did offer to continue negotiations, but without the Prohibited Activities Provision. The termination was to be effective on November 7, 2015.

48. On August 21, 2015, Tarkett acknowledged receipt of the notice of termination and reminded Linron of its continuing obligations -- for a period of one year from November 7, 2015 -- under the Prohibited Activities Provision. A copy of Tarkett's August 21, 2015, letter is attached as Exhibit G.

49. Although the Prohibited Activities Provision requires Linron, Harris, and Krienke to refrain from competing with Tarkett for a period of one year following termination of the 1996 Agreement, they have ignored their contractual obligations by competing with Tarkett.

50. Although Tarkett had agreed not to enforce the Prohibited Activities Provision for a limited period of time -- i.e., until Tarkett notified Linron that it was able to produce quality product again -- that time has long since passed. Tarkett has been ready, willing, and able to perform under the 1996 Agreement, and the Linron Defendants have unjustifiably failed and refused to do so.

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

51. The unwarranted and unjustifiable refusal of the Linron Defendants to perform according to the terms of the 1996 Agreement has resulted in many millions of dollars of past and future lost sales to Walmart and other customers, the inability of Tarkett to recycle the flooring removed from Walmart stores, which has resulted in increased production costs and the impairment of Tarkett's sustainability initiative, and impairment of Tarkett's relationship with Walmart and other customers.

### COUNT 1:  Breach of Contract (Specific Performance)
**(Against Linron, Harris, and Krienke)**

52. Tarkett incorporates by reference the allegations set forth in paragraphs 1 through 51 as if fully restated.

53. A binding contract was formed when Linron, Harris, and Krienke voluntarily and willingly entered into the 1996 Agreement (including all related amendments thereto) with Tarkett through Tarkett's predecessors in interest. *See* Exhibits A, C, D.

54. Tarkett performed its contractual obligations under the 1996 Agreement.

55. The 1996 Agreement provided that Linron, Harris, and Krienke would sell Tarkett Products on an exclusive basis to Walmart, and that Linron, Harris, and Krienke would use their best efforts to perform under the terms of that agreement. *See* Exhibit A, ¶¶ 1,4.

56. Linron, Harris, and Krienke breached their contractual obligations when they did not act in good faith, and made repeated misrepresentations to Tarkett in order to avoid their contractual obligations under the 1996 Agreement.

57. Notwithstanding their contractual obligations, Linron, Harris, and Krienke have, during the course of the 1996 Agreement and thereafter, improperly, knowingly, and deliberately breached the terms of the 1996 Agreement by selling products to Walmart that directly compete with Tarkett Products and by depriving Tarkett of sales of its flooring products to Walmart.

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

58. Linron, Harris, and Krienke breached the terms of the 1996 Agreement without legal excuse.

59. The acts of Linron, Harris, and Krienke have caused Tarkett immediate and irreparable harm and injury, which pursuant to the express terms of the Prohibited Activities Provision in the 1996 Agreement, entitles Tarkett to specific performance. *See id.* at ¶4/b).

60. Based on the foregoing, Tarkett requests that this Court enter an order of specific performance enforcing the Prohibited Activities Provision and enjoining Linron, Harris, and Krienke from selling any products to Walmart that compete with Tarkett's products for that period of time during the term of the 1996 Agreement that Linron, Harris and Krienke unjustifiably violated the Prohibited Activities Provision *plus* a period of one year.

### COUNT II:  Breach of Contract (Damages)
### (Against Linron, Harris, and Krienke)

61. Tarkett incorporates by reference the allegations set forth in paragraphs 1 through 60 as if fully restated.

62. A binding contract was formed when Linron, Harris, and Krienke voluntarily and willingly entered into the 1996 Agreement (including all related amendments thereto) with Tarkett through Tarkett's predecessors in interest. *See* Exhibits A, C, D.

63. Tarkett performed its contractual obligations under the 1996 Agreement.

64. The 1996 Agreement provided that Linron, Harris and Krienke would sell Tarkett Products on an exclusive basis to Walmart and that Linron, Harris and Krienke would use their best efforts to perform under the terms of that agreement. *See* Exhibit A, ¶¶ 1,4.

65. Linron, Harris and Krienke breached their contractual obligations when they did not act in good faith, and made repeated misrepresentations to Tarkett in order to avoid their contractual obligations under the 1996 Agreement.

66. Notwithstanding their contractual obligations, Linron, Harris and Krienke have, during the course of the 1996 Agreement and thereafter, improperly, knowingly and deliberately breached the terms of the 1996 Agreement by selling products to Walmart that directly compete with Tarkett Products and by depriving Tarkett of sales of its flooring products to Walmart.

67. Linron, Harris, and Krienke breached the terms of the 1996 Agreement without legal excuse.

68. The Prohibited Activities Provision of the 1996 Agreement explicitly provides that Tarkett's entitlement to equitable relief, including specific performance, does not foreclose the option to seek and obtain any other additional remedies that may be available to Tarkett.

69. As a result of the acts of Linron, Harris, and Krienke, Tarkett has lost sales and incurred other damages and losses in an amount that will be proven at trial but which exceeds $75,000.

### COUNT III: Breach of Implied Contract
### (Against Linron, Harris, and Krienke)

70. Tarkett incorporates by reference the allegations set forth in paragraphs 1 through 69 as if fully restated.

71. Through the course of dealing and through mutual agreement and understanding, Linron, Harris, Krienke, and Tarkett agreed that flooring that was removed from Walmart locations would be returned to Tarkett for recycling.

72. Linron, Harris, Krienke, and Tarkett mutually understood that this recycling was essential to Tarkett's sustainability initiative and also allowed Tarkett to reduce its production costs. In turn, Linron, Harris, Krienke, and Tarkett mutually understood that this arrangement benefitted Linron, Harris, and Krienke as it enabled Linron, Harris, and Krienke to purchase Tarkett Products at a reduced price.

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

73. In 2015, Linron, Harris, and Krienke failed and refused to provide the old, removed flooring to Tarkett in violation of their implied contract and course of dealing.

74. Tarkett performed in accordance with the implied contract and course of dealing.

75. Linron, Harris, and Krienke's conduct has caused Tarkett to incur increased production costs and has impaired it sustainability initiative.

76. As a result of this conduct, Tarkett has been damaged in an amount that will be proven at trial but which exceeds $75,000.

### COUNT IV: Intentional Misrepresentation
### (Against All of the Linron Defendants)

77. Tarkett incorporates by reference the allegations set forth in paragraphs 1 through 76 as if fully restated.

78. Linron, Harris, and Krienke represented to Tarkett that it had been "kicked out of Walmart," and that Walmart refused to accept Tarkett Products until certain production issues were resolved.

79. The Linron Defendants represented to Tarkett that Walmart would no longer accept Tarkett as its sole flooring supplier and that Walmart required a second source for its flooring needs.

80. These representations were material to Tarkett as these representations induced Tarkett to forego enforcement of certain legal rights and remedies that were available to it, and these representations induced Tarkett to incur significant production and other business-related expenses.

81. In fact, the representations made by the Linron Defendants were not only false, but also they were made by the Linron Defendants with knowledge of their falsity, or, at a minimum,

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

they were made with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred.

82. The Linron Defendants' representations were made with the deliberate intent of misleading Tarkett into relying on these representations, which Tarkett reasonably and justifiably did.

83. The misrepresentations made by the Linron Defendants have caused Tarkett to incur damages in an amount that will be proven at trial but that exceeds $75,000.

## COUNT V: Tortious Interference With Business Relationships
### (Against de Beaumont)

84. Tarkett incorporates by reference the allegations set forth in paragraphs 1 through 83 as if fully restated.

85. Tarkett maintained business relationships with existing and prospective customers.

86. As a former Tarkett executive, and as an employee of Linron, de Beaumont had extensive knowledge of Tarkett's business relationships with its existing and prospective customers.

87. After terminating his employment with Tarkett, de Beaumont has intentionally and improperly made (and upon information and belief continues to make) negative, false, and/or disparaging remarks about Tarkett to its existing and prospective customers with the deliberate intention of disrupting or terminating its current and prospective business relationships and opportunities.

88. Moreover, de Beaumont has intentionally and improperly attempted to steer Tarkett's business opportunities and relationships to Vinylasa and other competitors of Tarkett, including entities in which he (and/or Harris and Krienke) may have or may have had an ownership interest.

89. de Beaumont does not possess any privilege or legal justification to interfere with Tarkett's business relationships.

90. de Beaumont's remarks and conduct have caused Tarkett to lose numerous business opportunities.

91. de Beaumont's conduct has caused Tarkett to incur damages in an amount that will be proven at trial but which exceed $75,000.

### COUNT VII: Breach of Contract
### (Against de Beaumont)

92. Tarkett incorporates by reference the allegations set forth in paragraphs 1 through 91 as if fully restated.

93. A binding contract was formed when Tarkett and de Beaumont voluntarily and willingly entered into the de Beaumont Separation Agreement. *See* Exhibit B.

94. Among other provisions, the de Beaumont Separation Agreement provided that de Beaumont would receive severance payments and other benefits (collectively, "Severance Benefits"), including but not limited to, a severance equal to one (1) year regular base salary, annual incentive payments, etc. in exchange for de Beaumont, among other obligations, agreeing not sharing proprietary or confidential information of Tarkett and not working for a competitor for one-year (unless narrow exceptions applied). *Id.* at ¶¶2, 4, 5.

95. Tarkett fully performed its contractual obligations under the de Beaumont Separation Agreement.

96. de Beaumont breached his contractual obligations when he relied on, copied, used, and/or disclosed Tarkett's confidential and proprietary information, when he performed certain services on behalf of Linron following the termination of his employment, and when he transacted

business with entities that directly or indirectly competed with Tarkett within one year of signing the de Beaumont Separation Agreement.

97. de Beaumont breached the de Beaumont Separation Agreement without legal excuse.

98. de Beaumont's acts have deprived Tarkett of the benefit of the bargain when it executed the de Beaumont Separation Agreement.

99. Based on the foregoing, Tarkett requests that this Court disgorge the Severance Benefits de Beaumont received under the de Beaumont Separation Agreement.

WHEREFORE Tarkett requests that judgment be entered in its favor as follows:

a. For an order of specific performance against Linron, Harris, and Krienke for a period equivalent to the time over which Linron, Harris and Krienke violated the Prohibited Activities Provision *plus* one year;

b. For an award of compensatory damages against Linron, Harris, and Krienke for violation of the Prohibited Activities Provision;

c. For an award of compensatory damages against Linron, Harris, and Krienke for breach of implied contract;

d. For an award of compensatory and punitive damages against each and every one of the Linron Defendants for intentional misrepresentation;

e. For an award of compensatory and punitive damages against de Beaumont for intentional interference with business relationships;

f. For disgorgement of severance payments and other benefits and payments under the de Beaumont Separation Agreement against de Beaumont for breach of contract; and

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

g. For such other relief, including an award of attorneys' fees, as this Court deems just and proper.

/s/ *Kimberly Moses*
KIMBERLY MOSES (0029601)
MARK KEANEY (~~0095318~~)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East 6th Street
Cleveland, Ohio 44114
(216) 622-8200
(216) 241-0816 (facsimile)
kmoses@calfee.com
mkeaney@calfee.com
Attorneys for Plaintiff

## JURY DEMAND

Pursuant to Rule 38 of the Ohio Rules of Civil Procedure, plaintiff Tarkett USA Inc. d/b/a

Tarkett North America requests a trial by jury for all issues so triable.

*/s/ Kimberly Moses*

One of the Attorneys for Tarkett USA Inc.

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

# EXHIBIT A

# AGREEMENT

*WB* *AW*

November 7
This Agreement is made as of ~~October~~ ___, 1996, among AZROCK INDUSTRIES INC, and NATIONAL FLOOR PRODUCTS COMPANY, INC. at P.O. Box 954, Florence, Alabama, 35631 (together with all of their affiliated entities, the "Company") and HARNIX CORPORATION D. B.A. LINRON COMPANY, Ron Harris and Linda Nix, 3675 W. T. C. Jester Boulevard, Suite C, Houston, Texas 77018, identified all of them as ("Linron").

1.  Appointment.

    a)  The Company hereby appoints Linron to promote the business of the Company as set forth in this Agreement and to solicit orders for the Company's resilient flooring and wall base products (the "Products") only from Walmart locations, excluding Canada, and McDonald's retail food outlets located in those Walmart locations (the "Accounts"), this appointment being limited to the sale of Products for installation in the Accounts' retail stores. The Company reserves the right to promote and solicit its products directly or indirectly through other distribution channels to the Accounts, wherever located and shall not be responsible to Linron or any Account for delivery of Products that are out-of-stock or otherwise unavailable.

    b)  Linron accepts this appointment and agrees to use its best efforts to perform under this Agreement.

    c)  The Company agrees to offer, through Linron, all of the applicable promotions that Company makes available to the afore mentioned Accounts.

2.  Linron's Activities and Responsibilities.

    Linron shall quote its prices to the Accounts and obtain orders for the Products. Linron shall contact and solicit orders from the Accounts on a repetitive, systematic basis. Linron shall be responsible for the delivery of the Products, including the tracking of shipments to job sites and acceptance of the Products by general contractors, and shall be the owner of Products, F.O.B. Company plant, and bear all risk of loss. Linron shall be the primary contact on all Product complaints and coordinate Product returns approved by the Company. Linron also shall keep the Company fully informed at all times of the status of Linron's activities on behalf of the Company and submit promptly those written and oral reports to the Company personnel at those locations as may be required by the Company. Linron shall not discuss with the Accounts the prices of the Company to Linron unless Linron is accompanied by a Company representative. Linron will bill all orders at its prices and issue credits to the Accounts, provided that Company shall not be obligated to reimburse Linron for such credits without Company's written consent. Company will bill Linron immediately upon shipments of Products to any Account location ~~and Account payments shall be remitted directly by the Account to Company~~, and Company will credit Linron for payment of Company's outstanding invoices to Linron and forward any excess amount to Linron within fifteen (15) days of Company's receipt of payment by Account. (1)   *RVD* *RW*

    (1) All billings by Linron to the Accounts for products shall both authorize and instruct the Accounts to make all payments on such billings directly to Company and in its name.

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

notwithstanding the foregoing, the Company shall use all reasonable efforts to forward any excess amount to Linron within ten (10) days of Company's receipt of payment by Account. Notwithstanding, Linron will pay Company immediately and directly on all Company invoices outstanding beyond thirty (30) days from the date of Company's invoice to Linron. Company's pricing and terms for the sale of Products to Linron, and Company's suggested resale pricing and terms for Linron's sales to the Accounts, are set forth on Schedule A to the Agreement.

3.  **Company Representatives.**

Linron shall cooperate fully with all Company representatives in order to promote the best interest of the Company and the sales of its products.

4.  **Prohibited Activities**

a) Neither Linron nor Ron Harris nor Linda Nix (individually or collectively "H/N") shall during the term of this Agreement and for a period of one (1) year (subject to modifications provided below) after termination of this Agreement for any reason, Compete with the Company in any Prohibited Enterprise.

The term "Compete" shall mean employment by, or the direct or indirect participation in (as an owner, shareholder, director, general or limited partner, officer, manager, consultant, or agent, or otherwise), any business, firm, corporation, partnership, or other entity or person which is engaged in a Prohibited Enterprise.

The term "Prohibited Enterprise" shall mean the solicitation of orders for Prohibited Product from, or sales of Prohibited Product to, (i) any person that has retail operations in more than one state where such person was a customer of the Company or its affiliates during the one (1) year prior to the termination of this Agreement, or (ii) any person that has retail operations in more than one state where the Company or its affiliates solicited such person for the sale of goods during the one (1) year prior to the termination of this Agreement.

The term "Prohibited Product" means any flooring or wall base products of any manufacturer competitive to the Company, except wood, ceramic, carpet, concrete-based flooring products, Flexco Vinyl and Rubber Wall Base Products, and Armstrong Floor Tile (but only for in-store maintenance and remodeling purposes in those Account stores where Armstrong Tile presently is installed.)

b) It is acknowledged and agreed that in the event that Linron or H/N breaches this Section 4, the Company will suffer immediate and irreparable harm and injury for which the Company will have not adequate remedy at law. Accordingly, the Company shall be absolutely entitled to obtain any form of equitable relief, including specific performance. The foregoing remedies and relief shall be cumulative and in addition to any other remedies available to the Company.

Linron and H/N represent to the Company that Linron's and H/N's experience and abilities are such that the restrictions contained in the Agreement will not prevent

-2-

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

Linron or H/N from obtaining employment and earning a living at Linron's or H/N's current economic level in the event of the termination of this Agreement. Linron and H/N represent to the Company that Linron and H/N have, prior to execution of this Agreement, reviewed this Agreement with legal counsel of Linron's and H/N's choice. Linron and H/N acknowledge that the restrictions contained in this Agreement are reasonable and necessary to protect the legitimate business interests of the Company.

5.    No Binding Authority.

Linron shall not have the right to make or execute any contract for or on behalf of the Company or otherwise obligate the Company in any way.

6.    Term and Termination.

The term of this Agreement shall be three (3) years from the date of the Agreement (the "Original Term"). This Agreement shall automatically renew for additional one (1) year terms (the "Renewal Term[s]), unless, at least ninety (90) days prior to the expiration of the Original Term or a Renewal Term, a party gives written notice to the other party of its intention to terminate this Agreement. Notwithstanding the foregoing, this Agreement may also be terminated:

a)    By notice of termination from either party to the other party, for any reason or no reason at all, which is sent 180 days prior to the effective date of the termination; and

b)    Upon notice of termination from either party to the other party based on the latter party's breach of this Agreement.

7.    Confidential Information.

Neither Linron nor H/N shall, at any time during the term of this Agreement or thereafter, disclose to any person or entity any Confidential Information learned or obtained by Linron or H/N during the term of this Agreement. As used herein, the term, "Confidential Information" means information disclosed to Linron or H/N or known by Linron or H/N as a consequence of or through their representation of the Company which in any way relates to (i) the Company's customers and suppliers, including but not limited to, the identity, purchase patterns, business practices, contact persons and records of any customer or supplier, (ii) the Company's business arrangements, including but not limited to, systems and methods of doing business and (iii) the Company's business information, including but not limited to, financial data, know-how, methods of operation, pricing, programs, merchandising and distribution.

8.    Miscellaneous.

All prior agreements and selling arrangements between the parties shall be superseded by this Agreement. This Agreement constitutes the complete terms and conditions of the appointment of Linron and related obligations of Linron and H/N and there are no other

-3-

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

understandings or agreements than those specifically stated herein. This Agreement may not be amended or modified except by written agreement signed by all parties or by the Company as permitted in this Agreement. The provisions in this Agreement (including, without limitation, those in Section 4) are severable, and if any provision or portion thereof is held to be invalid or enforceable for any reason, such provision or portion shall be modified or adjusted by a court or other tribunal exercising its equitable powers to the extent necessary to cure such invalidity or unenforceability, and all other covenants and provisions shall remain valid and enforceable. Neither Linron nor H/N nor the Company may assign their rights and obligations hereunder, except that Company may assign its rights and obligations to any affiliate or successor in interest to Company. Ron Harris shall execute personal guaranty agreement in the form attached hereto as Exhibit A, an Accounts receivable and Proceeds

NOW THEREFORE, the parties hereto have caused this Agreement to be duly executed as of the date first stated above.

HARNIX CORPORATION, D.B.A LINRON:

COMPANY:

By: _Ron Harris_

By: _Robert Van Buren_

Robert Van Buren

Title: _President_

Title: President & CEO

_Debbie Wade_

witness

_Ron Harris_

Ron Harris, an individual

_witness_

witness

_Linda Nix_

Linda Nix, an individual

-4-

Linron/linron.doc. 10/17/96

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

# EXHIBIT B

# SEPARATION AGREEMENT AND RELEASE

WHEREAS, Gilles de Beaumont ("Employee") is currently employed by Tarkett USA Inc. (the "Company") pursuant to an Employment Agreement dated November 21, 2000 (the "Employment Agreement"); and

WHEREAS, the Employment Agreement provides for monetary payments and certain other benefits upon termination of Employee's employment under circumstances as defined in the Employment Agreement; and

WHEREAS, due restructuring of certain segments of the Company's business, Employee's position is being eliminated, and Employee is therefore separating from employment with the Company; and

WHEREAS, the parties wish to provide for an orderly transition of Employee's responsibilities, and have come to agreement on the terms and conditions of his separation of employment (including rights and obligations of the parties under the Employment Agreement), as set forth herein; and

WHEREAS, it is the intent of the parties that this Separation Agreement and Release will in all respects replace and supersede the Employment Agreement;

NOW, THEREFORE, in consideration of the payments and benefits as set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties enter into this Separation Agreement and Release as follows:

1.     <u>Termination of Employment.</u> Employee acknowledges that his employment with the Company shall terminate as of March 28, 2014 ("Separation Date"). From the Effective Date through the Separation Date, (the "Transition Period"), Employee will continue with his current assignments, and also on projects and matters assigned to him by Company management. Employee agrees that he will travel as necessary for his assignments.

2.     <u>Severance and other Benefits and Payments.</u>

(a)     Provided that Employee has executed and has not revoked this Agreement, and that Employee re-executes the Agreement as of the Separation Date, Employee will receive severance and other benefits (collectively, "Severance Benefits") as follows:

(i) Employee will be paid a severance ("Severance Payments") equal to one (1) year regular base salary, which will be at the rate applicable to Employee at the time employment terminates and will be paid during regular pay intervals during the one (1) year period ("Severance Period") commencing on the on the Separation Date.

(ii) Employee will be eligible to continue to participate in applicable medical and dental coverage program(s) available to Company employees for the duration of the Severance Period. At the conclusion of the Severance Period, Employee will be provided with information concerning his rights to benefit continuation under COBRA and any other applicable law. All other Company benefits, including but not limited to insurance programs (other than medical and dental insurance as addressed herein), the 401k program, and an automobile allowance, will terminate as of the Separation Date.

1

(iii)   Any Annual Incentive due to Employee for fiscal year 2013, based on applicable financial criteria and achievement of personal objectives, will be paid to Employee when payments are made to other participants in the Annual Incentive Plan.

(b)   Employee agrees and acknowledges that the foregoing Severance Benefits constitute good, valuable and adequate consideration for his covenants and obligations set forth herein, it being an amount over and above any entitlements, severance or otherwise, that Employee has or may have had by reason of Employee's separation from employment with the Company.

3.   <u>Termination for Cause or Voluntary Termination.</u>  Notwithstanding the foregoing, if employment terminates prior to the Separation Date for any of the following reasons:

(a)   Employee's death, Disability (defined as total disability entitling Employee to long-term disability benefits under any applicable long-term disability plan maintained by the Company), or legal incompetence;

(b)   The issuance by the Company of a notice terminating employment "for Cause" (which, for these purposes, means: (i) material breach of any term of this agreement or any other duty to the Company, which breach remains uncured for 30 days following Employee's receipt of written notice specifying the nature of the breach (provided, however, that if such 30 day period would have a material adverse affect on the Company, then no notice and opportunity to cure shall be required prior to termination for Cause hereunder); (ii) dishonesty, fraud, or failure to abide by the published ethical standards, conflict of interest, or other policies of the Company;  (iii) Employee's conviction for any felony crime, or for any other crime involving misappropriation of money or other property of the Company; (iv) misconduct, malfeasance or insubordination; (v) alcohol or drug abuse by Employee; or (vi) material neglect of duties, or willful or intentional misconduct);

(c)   Employee voluntarily resigns from employment;

then, in such case, the Company will pay any unpaid portion of Employee's salary earned through the date employment ends, as well as any accrued unused vacation time to which Employee is entitled under applicable Company policies. Otherwise, the Company shall have no further obligation to pay compensation of any nature (including but not limited to salary, Severance, benefits, bonus or incentives) after termination. Employee will be provided with information concerning any rights to benefit continuation under COBRA and any other applicable laws. Except to the extent that Employee exercises his rights to benefit continuation, all Company-provided benefits will end as of the termination date.

4.   <u>Confidential Information.</u>  Employee acknowledges that, through the course of his employment with the Company, he has received and/or had access to various proprietary or confidential information of the Company and/or its Affiliates (including product information, product development and design, the identity of customers and employees; vendor information; marketing information and strategies; sales training techniques and programs; acquisition and divestiture opportunities and discussions; and data processing and management information systems, programs, and practices). Employee agrees that he will not copy, disclose, or otherwise use such information or contest its confidential or proprietary nature following the end of his employment with the Company.  Employee agrees to return any and all written documents containing such information to the Company upon termination of his employment.

5.   <u>Restrictive Covenants.</u>

A.   <u>No Hiring.</u>  For the duration of his employment and continuing 12 months after termination, Employee agrees not to employ or retain, have any other person or firm

2

employ or retain, or otherwise participate in the employment or retention of any person who was an employee or consultant of the Company at any time during the 12 months preceding the end of his employment.

B.  Non-Competition. Employee agrees that for a period of twelve (12) months after the termination of his employment for any reason (whether by the Company with or without Cause, or voluntarily by Employee) he will not be employed by, own, manage, operate, or control, or participate, directly or indirectly, in the ownership, management, operation, or control of, or be connected with (whether as a director, officer, employee, partner, consultant, or otherwise), any business which competes with the business of the Company, including but not limited to manufacture, sale, marketing and/or distribution of flooring products and accessories thereto (the "Non-compete Obligation."). Notwithstanding the foregoing, Employee and the Company acknowledge that they have discussed a potential opportunity for Employee to perform services on behalf of Linron, Inc., a distributor that has distributed Company products to a large commercial customer, and the parties have agreed that such services will not be considered to be in violation of this paragraph, provided that (i) Employee does not engage in any activities on behalf of Linron, Inc. involving products that are competitive with the Company's products (unless the Company is first presented with the opportunity to supply such products and declines), and (ii) Employee abides by paragraph 4, above, in the course of rendering such services.

C.  It is understood that the purpose of Paragraphs 4 and 5 is to protect the legitimate interests of the Company without depriving Employee of the right to earn a living by carrying on his occupation. The employee hereby acknowledges that these no-hiring and non-competition clauses contain reasonable restrictions with respect to time, scope of work and geographic limitations, and that the foregoing are necessary to protect the legitimate interests of the Company. In the event that a court should decide that these clauses or any part thereof are reasonable with regard to the particular circumstances, it is understood that the court will reduce the scope of that part of the clause to a restriction that it considers reasonable.

D.  Specific Performance and Injunctive Relief. Employee acknowledges that the Company will be irreparably damaged if the provisions of Paragraphs 4 and 5 are not specifically enforced, that monetary damages will not provide an adequate remedy to the Company, and that the Company is entitled to an injunction (preliminary, temporary, or final) restraining any violation of this agreement (without any bond or other security being required), or any other appropriate decree of specific performance. Such remedies are not exclusive and shall be in addition to any other remedy which the Company may have.

6.  Company Property. Employee agrees and acknowledges that will, upon termination of his employment, return to the Company all originals and copies of Company documents and all Company property, including without limitation, computer files, discs, database information, client information, sales documents, personnel records, financial statements, budgets and forecasts, computers and keys. Notwithstanding the foregoing, the Company agrees that:

(a) Employee will be permitted to keep the office furniture identified on Schedule 1 hereto;
(b) Employee may retain the mobile telephone number currently assigned to the Company phone utilized by Employee. The Company will cooperate with Employee in facilitating the transfer of such number to Employee's personal mobile telephone, and Employee will immediately return his Company telephone.

3

(c) Employee may arrange to purchase the automobile leased by the Company and currently used by Employee (such purchase to be negotiated directly between Employee and the leasing agency).

7. _Release._ Employee does hereby for himself/herself and his heirs, executors, successors, and assigns, release and forever discharge the Company, its parent company, subsidiaries and parent company subsidiaries and their respective officers, directors, management, representatives, employees, shareholders, agents, successors, assigns, attorneys and other affiliated persons, both known and unknown (hereinafter "the Releasees") of and from any and all claims, demands, actions or causes of action, damages, or suits at law or equity, of whatsoever kind or nature, known or unknown, including, but not limited to, all claims and/or demands for back pay, reinstatement, hire or re-hire, front pay, workers' compensation, group insurance or employee benefits of whatsoever kind (except on rights expressly provided for herein), claims for monies and/or expenses, any claims arising out of or relating to Employee's employment with the Company, the cessation of Employee's employment with the Company, any claims for failing to obtain employment at any other company or with any other person or employer, and/or demands for attorney's fees and legal expenses, and any other claims that Employee has or may have by reason of any matter or thing arising out of, or in any way connected with, directly or indirectly, any act and/or omission that has occurred prior to the Effective Date of this Release.

This Release does not apply to Employee's entitlement under 401(k) plan(s) maintained by the Company, to any vested rights which Employee may have under any any Company pension plan, or to the Company's obligation to provide Severance Benefits as set forth in Paragraph 1 of this Release.

5. _ADEA._ Employee recognizes and understands that, by executing this Release, Employee will be releasing the Company and those referred to in paragraph (4) above from any claims that Employee now has, may have, or subsequently may have under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621, et seq., as amended, by reason of any matter or thing arising out of, or in any way connected with, directly or indirectly, any acts or omissions which have occurred prior to and including the Effective Date of this Release. In other words, Employee will have none of the legal rights against the Company and those referred to in paragraph (4) above, that Employee would otherwise have under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621, et seq., as amended, by signing this Release.

6. _Rights under Other Laws Specifically Waived._ Employee further recognizes and understands that, by executing this Release, Employee shall be releasing the Company and those referred to in paragraph (4) above from any claims that Employee now has, may have, or subsequently may have under the Civil Rights Act of 1966, 42 U.S.C. §1981 as amended, Title VII, the Civil Rights Act of 1964, the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq., the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601 et seq., the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§2101 et seq., or the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§201 et seq., or any applicable state law equivalent, by reason of any matter or thing arising out of, or in any way connected with, directly or indirectly, any acts or omissions which have occurred prior to and including the Effective Date of this Release. In other words, Employee will have none of the legal rights against the aforementioned that Employee would otherwise have under these laws by signing this Release. The laws listed in this Paragraph 6 are by way of example only and are not meant to be exclusive of other applicable laws. THIS IS A GENERAL RELEASE OF CLAIMS.

7. _21-Day "Consideration Period"._ The Company hereby notifies Employee of Employee's right to consult with his chosen legal counsel before signing this Release. Employee acknowledges receiving not less than twenty-one (21) calendar days in which to consider this Release to insure that Employee's execution of this Release is knowing and voluntary. In signing below, Employee expressly

4

acknowledges that he/she has had at least twenty-one (21) days to consider this Release and that his execution of same is with full knowledge of the consequences thereof and is of Employee's own free will.

8. **Warrants.** Employee warrants and represents that, prior to and including the Effective Date of this Release, no claim, demand, cause of action, or obligation which is subject to this Release has been assigned or transferred to any other person or entity, and no other person or entity has or has had any interest in said claims, demands, causes of action, or obligations, and that Employee has the sole right to execute this Release.

9. **Revocation Period.** Employee recognizes that, for a period of seven (7) calendar days following his execution of this Release, he may revoke this Release by providing written notice revoking the same, within this seven (7) day period, to Tarkett USA Inc., 16910 Munn Road, Chagrin Falls, Ohio (Attention: President). In the event of revocation, Employee would not be entitled to Severance or any other benefits provided by the Severance Agreement.

Should Employee revoke this Release within this seven-day (7) period, Employee agrees immediately to return all Severance and other benefits that Employee has received from the Company on account of his separation from employment prior to the date of such revocation.

10. **Voluntary Release.** Employee acknowledges and agrees that his election to execute this Release is entirely voluntary, and hereby acknowledges that he has not been pressured, coerced, or otherwise unduly influenced by the Company to execute this Release.

11. **Severability.** If a court which has jurisdiction finds that any provision of this Release is invalid, void or unenforceable, all remaining portions of this Release shall remain in full force and effect. Similarly, if a court which has jurisdiction finds that any provision of this Release as applied to particular persons, places and/or circumstances is invalid, unenforceable, or void, the provision as applied to any other persons, places, or circumstances and the balance of the Release shall remain in full force and effect.

12. **Governing Law.** This Release shall be governed and interpreted pursuant to the laws of the State of Ohio.

CAUTION TO EMPLOYEE: YOU HAVE THE RIGHT TO CONSULT AN ATTORNEY BEFORE SIGNING. THIS DOCUMENT CONTAINS A RELEASE OF ALL CLAIMS AGAINST RELEASEES PRIOR TO THE EFFECTIVE DATE OF THIS RELEASE.

DATE OF RECEIPT OF RELEASE
BY EMPLOYEE:

_March 13, 2014_
Date

SIGNATURE OF EMPLOYEE
ACKNOWLEDGING DATE OF RECEIPT:

_[signature]_
Employee Signature

RECEIPT WITNESSED BY:

_Angela Adams_

ANGELA M. ADAMS
Notary Public, State of Texas
My Commission Expires
June 08, 2016

5

AGREED TO AND ACCEPTED BY
EMPLOYEE:

_March 13, 2014_
Date
("EFFECTIVE DATE" OF THIS RELEASE
IS THE 8th DAY AFTER THIS RELEASE
IS SIGNED)

Employee Signature

EXECUTION BY EMPLOYEE WITNESSED BY:

Angela Adams

ACKNOWLEDGED:
TARKETT USA INC.

BY: _____

TITLE: _President, COO_

DATE: _3/24/14_

ANGELA M. ADAMS
Notary Public, State of Texas
My Commission Expires
June 08, 2015

RE-EXECUTED AND ACCEPTED BY
EMPLOYEE AS OF THE SEPARATION DATE:

_March 13, 2014_
Date

Employee Signature

EXECUTION BY EMPLOYEE WITNESSED BY:

Angela Adams

ANGELA M. ADAMS
Notary Public, State of Texas
My Commission Expires
June 08, 2015

6

SCHEDULE 1

Furniture

- Wood Desk – 82"x42"
- Wood Round Table with 4 chairs – 40"
- Wood Credenza – 70" x 20"
- Wood File Storage Cabinet – 30"x 78"
- Faux Leather Desk Chair

*03-13-14*

7

# EXHIBIT C

## FIRST EXTENSION OF NOVEMBER 7, 1996, AGREEMENT

This Extension Agreement is effective November 6, 2015, and the parties to this Extension Agreement are TARKETT USA, INC. as successor to Azrock Industries, Inc. and National Floor Products Company, Inc. ("TARKETT") and HARNIX CORPORATION d/b/a LINRON COMPANY, RON HARRIS, and LINDA KRIENKE nee NIX (collectively, "LINRON").

WHEREAS, TARKETT and LINRON entered into an Agreement as of November 7, 1996, a copy of which is attached hereto as Exhibit A (the "AGREEMENT"); and

WHEREAS, the term of the AGREEMENT was extended to November 7, 2015, by its own terms and the actions or inactions of TARKETT and LINRON; and

WHEREAS, on or about April 14, 2015, TARKETT acknowledged in writing Walmart's concerns with production and quality issues related to WM30 product (see Exhibit B) and agreed not to enforce Section 4 of the AGREEMENT until such time as the production of WM30 is restored; and

WHEREAS, on or about August 7, 2015, LINRON gave timely written notice of its intent to terminate the AGREEMENT upon the expiration of its previously renewed term on November 7, 2015; and,

WHEREAS, the parties wish to extend the AGREEMENT to continue to negotiate a new agreement on mutually acceptable terms:

ACCORDINGLY, THE PARTIES AGREE AS FOLLOWS:

1. The AGREEMENT is extended to December 31, 2015.

2. The AGREEMENT may not be extended further without a written agreement between the parties.

3. TARKETT's forbearance with respect to Section 4 of the AGREEMENT is extended through December 31, 2015.

HARNIX CORPORATION, d/b/a LINRON

TARKETT USA INC.

Signature: _Ron Hari_
(Please Print): _RON HARRIS_
Title: _PRESIDENT_
Date: _11-2-15_

Signature: _Mark Bischoff_
(Please Print): Mark Bischoff
Title: Vice President Sales
Date: 11/5/2015

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG

Signature: _Ron Harris_
Ron Harris


Signature: _Linda Krienke_
Linda Krienke

Page 2 of 2

# EXHIBIT D

# SECOND EXTENSION OF NOVEMBER 7, 1996, AGREEMENT

This Extension Agreement is effective December 31, 2015, and the parties to this Extension Agreement are **TARKETT USA, INC.** as successor to Azrock Industries, Inc. and National Floor Products Company, Inc. ("TARKETT") and **HARNIX CORPORATION d/b/a LINRON COMPANY, RON HARRIS,** and **LINDA KRIENKE nee NIX** (collectively, "LINRON").

WHEREAS, **TARKETT** and **LINRON** entered into an Agreement as of November 7, 1996, (the "AGREEMENT"); and

WHEREAS, the term of the AGREEMENT was extended to November 7, 2015, by its own terms and the actions or inactions of **TARKETT** and **LINRON**; and

WHEREAS, on or about April 14, 2015, **TARKETT** acknowledged in writing Walmart's concerns with production and quality issues related to WM30 product and agreed not to enforce Section 4 of the AGREEMENT until such time as the production of WM30 is restored; and

WHEREAS, on or about August 7, 2015, **LINRON** gave timely written notice of its intent to terminate the AGREEMENT upon the expiration of its previously renewed term on November 7, 2015; and,

WHEREAS, the AGREEMENT was extended to December 31, 2015, pursuant to the FIRST EXTENSION OF NOVEMBER 7, 1996, AGREEMENT (see Exhibit 1); and

WHEREAS, the parties wish to further extend the AGREEMENT to continue to negotiate a new agreement on mutually acceptable terms:

ACCORDINGLY, THE PARTIES AGREE AS FOLLOWS:

1. The AGREEMENT is extended to January 31, 2016.

2. The AGREEMENT may not be extended further without a written agreement between the parties.

3. TARKETT's forbearance with respect to Section 4 of the AGREEMENT is extended through January 31, 2016.

**HARNIX CORPORATION, d/b/a LINRON**

Signature: _John R Harris_
(Please Print): _JOHN R HARRIS_
Title: _PRESIDENT_

**TARKETT USA INC.**

Signature: _____
(Please Print): _Jeff Kowal._
Title: _President C.C._

Page 1 of 2

Date: _____12-22-15_____     Date: ___12/21/2015___

Signature: _Ron Harris_
Ron Harris

Signature: _Q. Q R. K_
Linda Krienke

# EXHIBIT E

## EVALUATION PERIOD METRICS

| Key Issue | How Measured: | What is acceptable/not acceptable | Time Frequency | ASTM Spec: | Proposed Specification |
|---|---|---|---|---|---|
| Surface is pitted and porous | Agreed upon master, signed by Linron, and Tarkett, to be matched for each run. Porosity and pitting metrics will be established and agreed upon prior to production of master. | Each retain must match master and must meet porosity and pitting metrics established. | Send key metrics after each production to Linron and for review. | The floor tile furnished in accordance with this specification shall be an acceptable match to approved samples in pattern, color, and surface appearance. | Perthometer reading established from tactile samples: Ra<150 RT<1600 RT <2600 Or fall within range of tactile feel for roughness of the master and 2 window samples. |
| Debris in the Tile/Canton | Agreed upon master, signed by Linron, and Tarkett, to be matched for each run. A specific debris metric (a number will be established) will be established once master is agreed upon. | Each retain must match master and must meet debris metrics established. | Send key metrics after each production to Linron and for review. | Acceptable quality level shall be 6.5 defects per 100 units | AQL of 3 per carton of that adversely affect performance or appearance such as blemishes, spots, indentations, cracks, blisters, and breaks in corners or edges. |
| Sting | Agreed upon master, signed by Linron, and Tarkett, to be matched for each run. A specific sizing metric (with a number) will be established once the master is agreed upon. | Each retain must match master and must meet sizing metrics established. | Send key metrics after each production to Linron and for review. | A tolerance of +/-.016 inches per linear foot | A total tolerance of +.002" to .015" MD of .005" to .015" AMD of .002" - .012" |
| Cut | Agreed upon master, signed by Linron, and Tarkett, to be matched for each run. A specific "cut" metric (with a number) will be established once the master is agreed upon. | Each retain must match master and must meet "cut" metrics | Send key metrics after each production to Linron and for review. | The out of squareness of the tile shall not exceed 0.010 inches. | Squareness tolerance level of .007 inches. (taper measurement) |

1

| Key Issue | How Measured | What is acceptable/not acceptable | Time Frequency | ASTM Spec | Proposed Specification |
|---|---|---|---|---|---|
| Pattern/Chip Distribution | Agreed upon master, signed by Linron, and Tarkett, to be matched for each run. A specific pattern metric (with a number) will be established once the master is agreed upon. | Each retain must match master and meet pattern metrics. | Send key metrics after each production to Linron and for review. | The floor tile furnished in accordance with this specification shall be an acceptable match to approved samples in pattern, color, and surface appearance | Agreed Master with visual windows for pattern (heavy / light ) need to be established. |
| Pink Tile/Base Color | Agreed upon master, signed by Linron, and Tarkett to be matched for each run. Metrics will be based upon spectrophotometer readings and agreed to by all parties. | Each retain must match master and meet spectrophotometer metrics | Send key metrics after each production Run to Linron and for review. | The floor tile furnished in accordance with this specification shall be an acceptable match to approved samples in pattern, color, and surface appearance | Color windows for light, dark, red, green, yellow, blue visually obtained and agreed upon. LAB measurement tolerances for each spectrum range as compared to the agreed master are: L=(87.19 to 85.34) A=(-.25 to -.8) B=(3.3 to 2.9) |
| Burnt Vinyl Contamination | Agreed upon master, signed by Linron, and Tarkett to be matched for each run. Metrics will be established with a number for an acceptable level of contamination and agreed upon once master is established. | Each retain must match master and meet contamination metrics. | Send key metrics each production to Linron and for review after each production run. | The floor tile furnished in accordance with this specification shall be an acceptable match to approved samples in pattern, color, and surface appearance | Production runs must fall within the agreed upon operating windows for color and pattern. |
| Ridges on the back of the tile | Establish master with identifiable and acceptable ridging (preferably developing a number of ridges or size of ridges) | Each retain must match ridge metrics | Send metrics after each production to Linron | Acceptable quality level shall be 6.5 defects per 100 units | AQL of 3 per carton Dinger / line size not to exceed .045 in diameter or circumference. |

2

| Key Issue | How Measured: | What is acceptable/not acceptable | Time Frequency | ASTM Spec | Proposed Specification |
|---|---|---|---|---|---|
| Murfreesboro - quick turnaround/pallet preparation | Establish reliability and logistics/packaging damage metrics. Signed packing set. | Each shipment must be in compliance with packaging specifications to minimize damage. | Representative sampling of packaging inspection results will be sent to Linron and after each shipment. | | Ensure use of Rubber Mats between transports |
| Lead Time | Establish agreed upon and practical lead time metrics. | Each shipment must be within lead time requirements as agreed upon. | Monthly lead time and reliability metrics will be sent to Linron. | | |

The evaluation period of the metrics stated herein shall be a ninety (90) day period commencing after first production is approved relating to Tarkett's production of VCT product 1789 pursuant to Linron's Customer orders. Subject to Tarkett's ongoing material compliance with the metrics defined herein after said evaluation period, Linron shall reintroduce VCT product WM30 into Walmart projects. By January 1, 2016, Linron shall utilize Tarkett's 1789 and WM30 all new Linron-approved Walmart projects, subject to Tarkett's ongoing material compliance with the metrics defined herein, unless otherwise modified by Tarkett and Linron in writing.

By signing this document all parties agree to the terms defined in these metrics.

Harnix Corporation, dba Linron

By: _John R Brun_     _5-6-15_
                                    DATE

Title: _PRESIDENT_

By: _J R Brun_     _5.6.15_
                                    DATE

Title: _EXECUTIVE V. CE PRESIDENT_

Tarkett USA Inc.

By: _[signature]_

Title: _President_     _5/15/15_
                                    DATE

3

# EXHIBIT F



866.4LINRON (546766) linron.com

August 7, 2015

Jeff Fenwick
President and COO
Tarkett USA, Inc.
30000 Aurora Road
Solon, OH 44139

Re:     Harnix Corporation d/b/a Linron Company

Dear Mr. Fenwick:

Please see the attached letter advising Tarkett USA, Inc. as successor to Azrock Industries, Inc. and National Floor Products Company, Inc. that Harnix Corporation d/b/a Linron Company, and Ron Harris and Linda Krienke nee Nix are giving notice of their intent to terminate, and not renew, the agreement between the parties at the end of its current term, namely November 7, 2015.

While Harnix d/b/a Linron and the individuals are terminating the current agreement at the end of its term, Harnix d/b/a Linron remains willing to negotiate with Tarkett towards a new agreement, consistent with the terms Harnix d/b/a Linron offered during the first quarter of 2015.

Please contact me if you have any questions.

Very Truly Yours,

Harnix Corporation d/b/a Linron Company

By: _Ron Harris_
       Ron Harris

3675 W. T.C. Jester, Ste. C
Houston, TX 77018



866.4LINRON (546766) linron.com

August 7, 2015

Jeff Fenwick
President and COO
Tarkett USA, Inc.
30000 Aurora Road
Solon, OH 44139

    Re:    November 7, 1996, Agreement between Tarkett USA, Inc. as successor to Azrock Industries, Inc. and National Floor Products Company, Inc. and Harnix Corporation d/b/a Linron Company, and Ron Harris and Linda Krienke nee Nix (the "Agreement")

Dear Mr. Fenwick:

    Notice is given pursuant to Section 6 of the referenced Agreement that Harnix Corporation d/b/a Linron Company, Ron Harris, and Linda Krienke nee Nix intend to terminate, and not renew, the Agreement at the end of its current term, namely November 7, 2015.

    Harnix, Mr. Harris, and Ms. Krienke reserve all other rights under the Agreement and do not waive any right to terminate the Agreement earlier based on Tarkett's breaches of the Agreement.

    Very Truly Yours,

Harnix Corporation d/b/a Linron Company

By: _Ron Harris_
    Ron Harris,

_Ron Harris_
Ron Harris, Individually

_Linda R. Krienke_
Linda Krienke, Individually

3675 W. T.C. Jester, Ste. C
Houston, TX 77018

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG



VIA OVERNIGHT DELIVERY

August 21, 2015

Harnix Corporation d/b/a Linron Company
Attention:    Ron Harris, President
              Ron Harris, individually
              Linda Krienke nee Nix, individually
3675 W. T.C. Jester, Suite C
Houston, Texas 77018

RE: Termination Notice dated August 7, 2015.

Dear Mr. Harris and Ms. Krienke:

We acknowledge receipt of your notice letter, dated August 7, 2015 to terminate and not renew the November 7, 1996 Agreement between Tarkett USA Inc., (as successor to Azrock Industries, Inc. and National Floor Products Company, Inc) and Harnix Corporation d/b/a Linron Company, Ron Harris, individually and Linda Krienke nee Nix, individually (Agreement).

We regret this decision by Linron. Tarkett remains open and willing to continue negotiations for a new agreement on mutually acceptable terms. Please be advised that Tarkett reserves all rights under the Agreement to enforce its terms, conditions and remedies (including, but not limited to "Prohibited Activities" under Section 4 of the Agreement) and does not waive any of its rights under the Agreement.

Joe Jared shall be in contact with Linron shortly to further discuss next steps related to the termination and potential negotiations of a new agreement.

Sincerely,

Jeff Fenwick
Chief Operating Officer

Electronically Filed 08/29/2016 15:00 / / CV 16 868321 / Confirmation Nbr. 841889 / CLKMG